THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. TYRONE WILSON, Defendant-Appellant.

Fourth District   No. 4—92—0643

Opinion filed September 9, 1993.

Daniel D. Yuhas and Gloria Ann Morris, both of State Appellate Defender's Office, of Springfield, for appellant.

Thomas J. Difanis, State's Attorney, of Urbana (Norbert J. Goetten, Robert J. Biderman, and Richard Norris, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE LUND delivered the opinion of the court:

Defendant Tyrone Wilson appeals his conviction on drug charges handed down by the circuit court of Champaign County claiming Judge Jensen erred in denying a motion to suppress evidence obtained as a result of a warrantless arrest. Following a stipulated bench trial before Judge Townsend, defendant was found guilty of unlawful possession with intent to deliver more than 1 gram but less than 15 grams of a substance containing cocaine (Ill. Rev. Stat. 1991, ch. 56½, par. 1401(c)(2)) and sentenced to 15 years' incarceration in the Department of Corrections.

Defendant was arrested on the basis of tips supplied by his girlfriend, Rebecca Ambrose. Officer John Murphy, of the Champaign police department, testified he knew Ambrose because he had been involved in a number of controlled drug purchases from her. In July or August 1991, Murphy executed a search warrant at the home she shared with defendant. At this time Ambrose provided information regarding defendant's drug activities, telling Murphy that defendant sold drugs out of a room at the Budgetel Hotel in Champaign. This information was partially confirmed when Murphy visited the hotel and found a registration card under defendant's name. A hotel employee told him that defendant was a regular guest.

On November 25, 1991, Murphy received a call from Ambrose, who said there were certain "activities taking place," but no specific details were given. The information provided was insufficient to place a specific person at a specific location. Later in his testimony Murphy provided these details, saying Ambrose had told him an apartment in the 300 block of West Columbia was going to be used to weigh and

bag cocaine. Ambrose also described defendant's car and gave him the license plate number. The following day Ambrose called again, but Murphy was unable to take the call. She called back later and spoke with Illinois State Police Officer Willie Gartrell, who was assigned to the same drug task force as Murphy. Gartrell did not know the identity of the caller.

The caller told Gartrell that defendant and Lee Creighton were bagging cocaine at a house on Columbia Street, just west of State Street. She did not know the exact address of the house, but described it as brown in color with a brown Toyota parked in the back alley. She also provided the license number of the car. Gartrell notified Murphy of the call, and they began a search of the area in separate cars. Although they were able to locate a house matching the description by Ambrose, no brown Toyota was found. Gartrell testified he could not recall if the brown house they found was the only brown house on the 300 block of Columbia Street. No description of the house was included in Murphy's police report.

After searching for 20 minutes and finding nothing, Gartrell received another call from the same woman he had spoken to earlier that day. Gartrell had talked with Murphy about the first call and determined that the caller was most likely Ambrose. Gartrell had never spoken with Ambrose before, but he recognized the voice in the second call as the same person who had called him earlier that day. During the second call Gartrell asked the caller if she was Rebecca Ambrose, but she refused to say.

Murphy's testimony differs in that he claims Gartrell already knew Ambrose's identity. According to Murphy, Gartrell thought he was the only officer to receive a call from Ambrose and knew her name before speaking with Murphy about the call. Gartrell, however, testified the caller never identified herself and that it was Murphy who supplied him with a name.

Gartrell learned from the second call that defendant and Creighton had left the house on Columbia and were driving to the 1500 block of Holly Hill to pick up Creighton's brother and take him to work. After this, the two planned to drive to Ambrose's trailer. Gartrell responded to the call by heading for Ambrose's trailer at 25 Sycamore Street. Murphy headed for the Holly Hill address, located northwest of the Columbia Street address. On the way to Holly Hill, Murphy spotted defendant's vehicle traveling east in the 700 block of West Bradley Street, about eight blocks from the Holly Hill residence. Murphy followed the vehicle long enough to bring in other officers in order to feel secure in stopping the car. The vehicle was under contin-

uous observation, and he observed that the vehicle made no stops other than for traffic control and no individuals approached the vehicle. Murphy recognized defendant as the passenger in the car.

Defendant's vehicle was stopped by Murphy. A car carrying Gartrell and Officer Eckhardt participated in the stop. Eckhardt testified he saw no indication of criminal activity or suspicious behavior. After the stop, Eckhardt ordered defendant to exit the vehicle and, shortly thereafter, he conducted a search of his person by patting him down and then looking in the coat pockets of the leather jacket he was wearing. He did not feel anything that may have been a weapon during the pat-down search. Eckhardt testified that at the time of the search defendant was not under arrest, but this was only because he had not said the "magic words." After looking through defendant's inside jacket pocket, Eckhardt found what appeared to be a controlled substance. At this point, he placed defendant under arrest.

Eckhardt testified the reason for stopping the car was to determine whether defendant was in possession of drugs. He had no personal knowledge of whether defendant would be in possession of drugs, and he was unable to verify any of the information supplied to him in the investigation up to that point. He could not say that defendant had ever visited the Columbia Street address, nor could he say whether defendant had been to the Holly Hill address. Gartrell, who was riding in the car with Eckhardt, was similarly unable to corroborate any of the information he had received in the two calls, other than the fact that defendant would be riding in a particular color Toyota with a specific license plate number.

Officer Murphy testified that the only information provided by the caller that he was able to independently verify was defendant's presence in a particular vehicle on a particular date. When asked if the caller was certain the controlled substance had been secured or whether she believed it had been secured, Murphy responded that he could not testify to her frame of mind. Also, he did not know where she was calling from. When asked to state his basis for stopping the vehicle, Murphy replied it was the caller's description of the vehicle alleged to be involved in the movement of cocaine and, once the vehicle was spotted, the fact that he was able to positively identify defendant as the passenger in the car. Defense counsel then asked:

> "Q. But isn't it true, Officer Murphy, that there was not definitive information provided to you that there was any contraband in this vehicle; is that correct?
>
> A. It was definitive in my mind based on the location of the vehicle, based on, as my report reflects, that the caller had in-

dicated that the bulk portion of the cocaine was being stored at Lee Creighton's house on Holly Hill; the proximity of the vehicle being 8 blocks from Holly Hill traveling in an eastbound direction, I felt that it was a very high chance that that's where the vehicle had just come from. The time frame involved between the call stating that the vehicle was in the 300 block of *** West Columbia and the time that myself and the other officers located my vehicle, I felt it was very consist[ent] *** with the information that we were receiving."

The State called one witness, Troy Daniels, an investigator with the Champaign County sheriff's office. He testified he had interviewed Ambrose on October 2, 1991, in regard to an unrelated murder investigation focusing on a person named Reyes Carabello. Ambrose told him that while counting defendant's money a few months earlier, she saw what appeared to be blood on some of the bills. Later, defendant allegedly told her that he had received this money from the "Louisiana people." Frank and Betty James were neighbors of defendant and came from Louisiana. Ambrose told Daniels she spoke with Frank James, who told her the money came from the person who killed a man at the Thomasboro motel. Daniels spoke with Betty James, who told him that she had taken money from Carabello and purchased cocaine from defendant. She did not recall that the money had blood on it. Significantly, Ambrose would not confirm that cocaine was purchased with the alleged bloody money. She would only say that defendant was in possession of bloody money and that he said he had received it from the Louisiana people. Although she would not say what was purchased with the money, she did not deny that cocaine may have been purchased with it.

On appeal, defendant contends the warrantless arrest violated his fourth amendment rights, as it was based upon uncorroborated information which was largely disproved during the police investigation prior to the arrest. The tipster, a known drug dealer, had never before supplied the police with information leading to an arrest, although she had previously given information about defendant which did not lead to an arrest. Defendant argues that none of the information provided by Ambrose on the day of the arrest could be corroborated and cites numerous inaccuracies in the information itself: (1) police were told defendant was in the 300 block of Columbia Street, but he was never found there; (2) a brown Toyota was supposedly parked in the alley behind this house, but a 20-minute search produced nothing; and (3) Ambrose told police that defendant was presently driving to the Holly Hills address, which would involve driving northwest, but

the police spotted his car driving east—away from the Holly Hills address. Defendant argues the only accurate information supplied was that defendant and Creighton were together, driving a brown Toyota with a specific license plate number. This information, defendant argues, was not evidence of a crime and would not warrant a person of reasonable caution to believe that defendant had committed a crime.

The State argues that information provided by Ambrose had proved reliable in the past, citing defendant's activities at the Budgetel Hotel in Champaign. Ambrose had told police he dealt drugs from this hotel, and a police investigation confirmed that he had indeed visited the hotel regularly. Furthermore, defendant was a known drug dealer, and the tip leading to his arrest was provided by his live-in girlfriend.

The State also notes Murphy's testimony that Ambrose had provided information resulting in the arrest of defendant. The State asked defendant:

"Q. Had she provided information either to you or to the Champaign Police Department concerning criminal activity that resulted in any arrests?

A. Yes, she did.

Q. Specifically, who was arrested as a result of her information?

A. Tyrone Wilson."

At first glance, the trial transcript indicates Murphy is referring to defendant's arrest in the case at hand. However, the State emphasizes in its brief that defendant had been arrested as a result of Ambrose's information on more than one occasion, and this arrest apparently occurred prior to the arrest in the case at hand. No detail, date, or other information is provided as to when this other arrest occurred or for what reason. We also note that defendant was still living with Ambrose at the time of the November 26, 1991, arrest. It requires a stretch of imagination to believe that defendant would still be living with the person responsible for his prior arrest, if he knew of it. Defendant's brief directly contradicts the State's claim, stating that Ambrose had never given information leading to *anyone's* arrest.

Another factor establishing Ambrose's reliability is Daniels' testimony that she had told him of bloody money in defendant's possession. The State contends that the value of this information is shown by the fact that Daniels referred to Carabello as "the defendant." Because Carabello was apparently charged with a crime, the State would have us assume the information provided by Ambrose must have played a significant role in his arrest. No such assumption is war-

ranted. The reason Daniels referred to Carabello as a defendant was because the prosecution framed the question, "What was the name of the defendant in that murder case?" Furthermore, the information supplied by Ambrose may very well have played no role whatsoever in Carabello's arrest, especially since Ambrose's information was contradicted by Betty James, who said the money was not bloody.

The State contends this case is similar to *People v. Beck* (1988), 167 Ill. App. 3d 412, 521 N.E.2d 269, which reversed a trial court's ruling that an informant's tip was insufficient to establish probable cause for a warrantless arrest. In *Beck*, a drug enforcement agent received a call at 8:15 a.m. from a confidential informant, advising that defendant had approximately 10 pounds of cannabis in the trunk of his car. The informant had seen the cannabis that morning and said that defendant was leaving home as he spoke. The informant provided the license number, the make and color of the car, and the anticipated direction of travel. The car was eventually stopped by police on a highway the informant thought they might be using and within the anticipated time frame. This confidential informant had provided information leading to arrests and/or convictions a minimum of four times prior to the information given in this case.

The *Beck* court found that even though the corroborative facts were few and pertained to innocent activities, the proper focus was whether the suspect's actions gave rise to an inference that the informant was credible and that he obtained his information in a reliable manner. The court ruled that the informant's veracity and reliability were given support by corroborated details of his tip. The fact that the informant provided information concerning criminal activity on a fairly regular basis and that this information had led to arrests and/or convictions on at least four occasions was strongly emphasized in the court's decision. The court found the corroborated details of the informant's tip—that a particular car was at a particular location at a given time—was sufficient to establish probable cause, especially because the police officer had worked with the informant in the past and information he received was reliable. *Beck*, 167 Ill. App. 3d at 419, 521 N.E.2d at 274.

The *Beck* decision is distinguishable from the case at hand, in that the informant actually saw the cannabis. In this case, no one knew where Ambrose was calling from, and there was no indication that she had ever seen the drugs. Additionally, in *Beck*, each detail of the informant's tip was corroborated, unlike the case at hand where many details were not. Finally, and perhaps most significant, is the fact the

informer in *Beck* had, in the past, given information that led to at least four arrests.

Defendant cites *People v. Adams* (1989), 131 Ill. 2d 387, 546 N.E.2d 561, where the supreme court affirmed the appellate court's reversal of a trial court's decision denying a motion to suppress. In *Adams*, the informant told police that defendant would be leaving for Kentucky to obtain some cocaine. Surveillance was set up around Adams' house, but he never left home on that evening. The informant called back to say the plan had changed. Sometime later, the informant contacted police and advised them that defendant had left for Kentucky and would return to Will County, Illinois, with cocaine. He warned that defendant would probably be armed with a handgun. The informant had earlier described defendant's car and given the license plate number. He also named the person from whom Adams would buy the cocaine, and police recognized the name as that of a local cocaine distributor. Police attempted to obtain a search warrant for defendant's vehicle, but were told that before a warrant could issue they would have to corroborate the fact that the vehicle was indeed traveling back from Kentucky. As a result, drug agents stationed themselves on highways throughout Indiana that might be used by a person returning from Kentucky. Defendant's car was spotted on Interstate 65, just south of Gary, Indiana. Police followed him back to Will County, stopped his car, and arrested him with the assistance of some 20 patrol cars. A handgun was recovered in the arrest.

In *Adams*, the police had numerous contacts with the informant, including a face-to-face meeting in which police collected personal information about him. The informant had never provided information to the police about anyone else before and did not have a police record. However, the informant was able to tell police that Adams had served time in prison for manslaughter, a fact which was confirmed by police prior to his arrest. The trial court found that because the informant was an ordinary citizen, his information was presumptively reliable and defendant's presence on Interstate 65 (a possible route from Kentucky) supported information that he possessed cocaine and a gun.

The supreme court disagreed, citing the fact that the informant gave no information regarding the time of Adams' departure from Illinois, nor did he reveal where in Kentucky Adams would meet his drug connection, Collins. Because they had no idea where in Kentucky that Adams would travel, it was impossible to estimate the time Adams would be expected to return to his home—information which could then be supported by his presence on the highway in Indiana at

a certain time. The court also noted the fact that police were so uncertain of defendant's route that officers were placed on several highways in Indiana. Furthermore, Adams' presence in Kentucky was never corroborated; nor was there corroboration that Collins and Adams knew each other or that Adams was even known to be involved in drug trafficking. Additionally, there was no information that Adams was traveling with a passenger.

Because the informant was not a witness to the transaction, and since the information he provided did not implicate himself, thereby increasing his reliability, the court found the situation required further verification. If the State had been able to verify that Adams had indeed been in Kentucky and had met Collins there, this would tend to support the informant's other information that Adams had cocaine and a gun in his possession. Such verification was not forthcoming, and the court concluded that Adams' mere presence on Interstate 65 did not create an inference that Adams was in Kentucky. Accordingly, the supreme court granted defendant's motion to suppress evidence as a result of the warrantless arrest.

We find the facts in the instant case similar to those of the *Adams* decision. The State was unable to verify that defendant ever visited the house on Columbia Street, nor is there any indication this house was ever located with any certainty. No proof exists that defendant ever traveled to the residence at Holly Hills and, at the time his car was spotted, he was roughly a mile away from the Holly Hills address and traveling in the opposite direction than anticipated. Defendant argues in his brief that Ambrose has never provided information leading to an arrest. The State's argument to the contrary is unsupported by the record. Like *Adams*, the police in the instant case knew only that defendant would be driving in a particular car, with a particular license plate. The only other verified information was that defendant would be traveling with a passenger (Creighton). Police had no description of Creighton and, prior to the arrest, were unable to identify anyone in the car other than defendant.

We also find it significant that in *Adams* the informant claimed the car would be transporting cocaine back to Illinois. In the case at hand, the informant only knew that cocaine was being bagged at the Columbia Street house. No indication was given to police that drugs were to be transported in the brown Toyota, and Ambrose gave no indication she ever saw the drugs. Officer Gartrell had no idea where she was calling from or how she obtained her information. Had he not spoken with Murphy, he would not have known anything about the

identity or background of the caller. The fact that Ambrose refused to identify herself cannot be ignored in evaluating her reliability.

A trial court's ruling on a motion to suppress will not be disturbed on review unless it is manifestly erroneous. In a determination of probable cause, the trial court must apply standards at least as stringent as those that guide a magistrate in issuing a warrant. The test is to determine whether " ' "a reasonable and prudent man, having the knowledge possessed by the officer at the time of the arrest, would believe the defendant committed the offense." ' " (*People v. Williams* (1991), 147 Ill. 2d 173, 209, 588 N.E.2d 983, 995, *cert. denied* (1992), ___ U.S. ___, 121 L. Ed. 2d 156, 113 S. Ct. 218, quoting *People v. Tisler* (1984), 103 Ill. 2d 226, 237, 469 N.E.2d 147, 153, quoting *People v. Wright* (1968), 41 Ill. 2d 170, 174, 242 N.E.2d 180, 183.) This analysis must focus on the facts available to officers prior to the arrest and must not be affected by hindsight. The standard for evaluating a warrantless arrest based upon an informant's tip is summarized in *Williams*, where the court stated:

"Whether the necessary probability exists is governed not by technical legal rules, but rather by commonsense considerations that are factual and practical. ***

*** Under the totality of the circumstances analysis, a deficiency in one prong of the traditional test of an informant's tip (credibility or reliability) may be compensated for in determining the overall reliability of the tip by a showing as to the other (the basis of knowledge). [Citation.]

Substantial corroboration would not only establish an informant's veracity, but would also support an inference that an informant obtained his story reliably. [Citation.] Whether such corroboration consists of innocent or incriminating activity is not the question. Instead, the proper focus is ' "whether the actions of the suspects, whatever their nature, give rise to an inference that the informant is credible and that he obtained his information in a reliable manner." ' " *Williams*, 147 Ill. 2d at 209-10, 588 N.E.2d at 995, quoting *Tisler*, 103 Ill. 2d at 251, 469 N.E.2d at 160, quoting *Illinois v. Gates* (1983), 462 U.S. 213, 269, 76 L. Ed. 2d 527, 568, 103 S. Ct. 2317, 2348 (White, J., concurring).

In denying the motion to suppress, the trial court noted that the facts in this case present a close call. Based upon the officer's prior experience of dealing with Ambrose and her uncanny ability to know so much about defendant's actions, the court found probable cause for the arrest.

848

Ambrose's lack of reliability is clearly demonstrated by her inability to predict defendant's location at particular times or, as in the case with the Columbia Street home, at a particular address. This deficiency is balanced against the accurate information she relayed concerning defendant's frequent presence at the Budgetel Hotel and the fact that defendant had received money from his neighbors, Frank and Betty James. The fact that she lived with defendant also adds to her credibility and presents a solid basis of knowledge underlying her tip. However, her refusal to identify herself to Gartrell severely diminishes her reliability. So, too, does the fact that she never stated how she knew the information or where she was calling from. We have no indication she ever saw any drugs, and her tip gives no indication that these drugs were to be found anywhere but the unknown address on Columbia Street. Accordingly, we find the trial court's denial of the motion to suppress manifestly erroneous.

Reversed.

STEIGMANN, P.J., and COOK, J., concur.