THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. STEVE TINGLE, Defendant-Appellant.

First District (1st Division)   Nos. 1—93—4385, 1—94—0342 cons.

Opinion filed April 15, 1996.—Rehearing denied May 20, 1996.

Michael J. Pelletier and Patricia Unsinn, both of State Appellate Defender's Office, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, James Fitzgerald, and Diane Meyer, Assistant State's Attorneys, of counsel), for the People.

JUSTICE WOLFSON delivered the opinion of the court:

Steve Tingle (Tingle) was charged with two armed robberies committed on separate days, November 10 and November 13, 1992. The evidence that led to Tingle's arrest, trials, and convictions was seized by a police officer from Tingle's car on November 14, 1992, after the defendant was arrested for disorderly conduct.

The defendant was tried separately for each offense. Each time a jury convicted him. He received a 15-year sentence for the armed robbery of Eugene Ogroden (Ogroden) and a consecutive seven-year sentence for the armed robbery of Martin Aguilera (Aguilera). The cases are consolidated on appeal.

The defendant's primary contention is that the searches and seizures of November 14 violated his fourth amendment rights, requiring a reversal of both convictions. We affirm the convictions.

FACTS

Hearing on Motion to Quash Arrest and Suppress Evidence

The State's only witness was Officer Oscar Brown (Brown).

On November 14, 1992, at around 9:10 p.m., Brown and his partner, Steve Smith, went to the area of 215 North Kostner in Chicago, Illinois. They were responding to a telephoned citizen's com-

plaint that there was narcotics activity in the area. There was no testimony identifying the caller or the caller's exact complaint. Officer Brown did not receive the call. When the police arrived, they saw a group of people at the mouth of an alley and a number of cars blocking one side of Kostner. Brown saw Tingle standing in the crowd. Brown approached Tingle, and as he did so, Tingle yelled "5-0." This phrase is used to alert narcotics sellers that the police are coming.

The crowd then began to disperse. Brown arrested Tingle for disorderly conduct because he shouted "5-0" and because he was with the crowd. Other members of the crowd were arrested on unspecified narcotics charges. Tingle asked if Brown "could secure his vehicle," which was double-parked on the 4400 block of West End Street in Chicago, Illinois, about 1$^1$/$_2$ blocks away. The officers drove to where Tingle's car was double-parked.

When he got to the car, Brown found it unlocked, the keys inside. Brown opened the door, turning on the interior light. Brown then observed the butt of a pistol stuck between the arm rest and the driver's seat. Brown recovered the pistol and searched the car for additional weapons. When he searched the unlocked glove compartment, he found another gun and two wallets. Opening the wallets, Brown found that they contained photo identifications that did not match Tingle. Testimony during trial would establish that these wallets belonged to Ogroden and Aguilera, both victims of armed robberies.

Tingle testified that he was on his way home around 7 p.m. when his car quit between Kostner and Kildare. He brought the car to a stop and double-parked it. Tingle turned on the headlights and tried to start the car, but nothing happened. He then turned off the lights and checked under the hood. Seeing no obvious problems, he again attempted to start the car. When that failed, Tingle got out his jumper cables, attached them to the battery, and tried to flag down someone to jump the car.

When Tingle could not get anybody to stop, he went to a store to call his mother and his friend Michael Beasley. He called both and asked them to come and give him a hand. He then left the store and went back to the car. He waited for around 20 minutes. When nobody came, he again attempted to find someone to jump his car. As he walked down the street, he saw a police officer.

Tingle approached the officer and told him that his car had stopped. The officer, however, grabbed Tingle and put handcuffs on him.

The trial court denied the defendant's motion to quash arrest and suppress evidence.

Trial of the Robbery of Eugene Ogroden

Tingle was first tried for the armed robbery of Eugene Ogroden. At this trial, Ogroden testified about the circumstances of the robbery.

Ogroden left work at about 5 p.m. on November 10, 1992. As he walked down Hubbard Street to his car, Ogroden noticed a dark, late model car come from behind him. Two men were in the car, which stopped about a quarter of a block away. One man got out of the car and began to approach Ogroden as he walked under a viaduct.

The man demanded Ogroden's wallet. At first, Ogroden protested. Then he noticed that the man was holding his right hand extended on his side. In his hand, the man held a chrome-plated revolver. Ogroden continued to protest, but the man once again demanded his wallet. Ogroden complied, handing his wallet to the robber. The wallet was made of orange nylon and contained $1,200 in cash, credit cards, a driver's license, and a couple of uncashed payroll checks.

Once he had the wallet, the man told Ogroden to turn around and walk back in the direction from which he came. Ogroden turned and walked a few steps, turned to go back, and was told to "keep going." Ogroden then took a few more steps and heard a gunshot. Ogroden believed the man then got back into the car. Ogroden saw the car go around the corner and leave the area.

The robbery took place at approximately 5:40 p.m. At about 6:40, Ogroden went to the police at the Chicago Avenue police station and reported the incident.

Late on November 14, 1992, the police contacted Ogroden and asked him to come to the station. They told him that they had recovered his wallet and that they wanted him to view a lineup. During the lineup, Ogroden identified Tingle as the man who had robbed him.

When Tingle's lawyer produced Floyd Chatman as an alibi witness, he tried to ask him on direct examination if he was telling the truth and not lying simply because he was Tingle's friend. The State objected to this line of questioning, and the objection was sustained. On cross-examination, the State played up the friendship, suggesting that Chatman might be an unreliable witness without directly asking if he was lying. On redirect, Tingle again attempted to ask if Chatman was lying, and the court sustained the State's objection.

Trial of Martin Aguilera

Tingle was tried for the armed robbery of Martin Aguilera. On November 13, 1992, at approximately 11:10 p.m., Aguilera was walking home along Belden near the Belden/Geneva intersection, having just gotten off the bus. The intersection was well lit by street lamps.

As he reached the intersection, Aguilera saw a young man who had just crossed the corner heading in his direction. Aguilera then looked down to turn on his Walkman. When he looked up again, the man was less than a foot in front of him, pointing a small, snub-nosed revolver at his chest. Aguilera looked up at him, and the man demanded his wallet.

Aguilera thought the man was kidding. He hesitated, and the man asked for his wallet again. Aguilera asked if he could just give him his money. The man hesitated, and Aguilera pulled about $7 from his pocket. The man said he wanted the wallet. When Aguilera tried to bargain with him again, the man replied "give me your wallet or I'll shoot you."

Aguilera asked the man if he could keep his identification. The man said that he would throw Aguilera's identification in the middle of the street. Aguilera gave the man his wallet, a small black billfold that held credit cards and identification. The man then told Aguilera to turn around and run.

Aguilera took three or four steps, then turned back. The man was gone. His wallet was not in the street. Aguilera looked for but did not see his wallet or the man who had robbed him. Aguilera then went home and called the police.

Aguilera talked to the police that night and explained what had happened. He described his attacker as being tall, or at least taller than he (Aguilera is 5 feet 4 inches tall), and having bumps on his face. He described the man's hair as having Jheri curls, by which he meant the man wore his hair shoulder length, with curls that were dry and clumped together, but not matted. He did not describe the robber as having any tattoos or facial hair.

Late on November 14, 1992, the police called Aguilera. They said that they had his wallet and that they wanted him to look at a lineup. When Aguilera arrived at the police station, they were not ready for him to view the lineup. He had learned that the police had recovered the wallet of another man, and he ended up talking to that man, Eugene Ogroden, while waiting to view the lineup. They briefly discussed the description of the man who had robbed them. When Aguilera examined the suspects in the lineup, he identified Tingle as the man who had robbed him. At some point that night, Aguilera learned that two brothers had been in the lineup; the record is unclear as to whether this occurred before or after the lineup. Steve Tingle was one of the brothers.

During the trial, Aguilera again identified Tingle as the man who had robbed him.

Common Issues of Fact in Both Trials

Brown testified at both trials about what he found in Tingle's car. During the search of his car, Tingle sat in the rear of a squad car. The first gun Brown found, the one between the driver's seat and arm rest, was a .32-caliber snub-nose revolver with black tape wrapped around the handle. The second gun, the one in the glove compartment, was a .32-caliber chrome revolver with gray duct tape around the handle. Each weapon was loaded with five live bullets. Brown secured both weapons to protect the crime scene.

Once the weapons were taken back to the station, they were never tested to see if they had been recently fired. No other bullets or empty ammunition boxes were found in Tingle's car.

Brown also testified about the contents of the wallets. One wallet was orange with Ogroden's driver's license, a few credit cards, and some other papers inside. The other wallet was made of black leather and contained Aguilera's credit cards and other articles in it.

During both trials, Tingle explained how he came upon a box containing two wallets and two guns. He testified that on November 14, 1992, from 6 a.m. to 5 p.m., he worked on his father-in-law's car at the corner of 18th and Springfield. While he was working under the car, he saw a man walk back and forth every 20 minutes to half an hour towards and into the alley. When Tingle decided that he needed to urinate, he went into the alley because his tools would be unprotected if he went inside. When he was done, he saw a brown box lying in the alley, about a foot long and half a foot wide. Its lid was closed. Tingle thought that the man he saw might have put it there because he saw the man bend down at the place where he found the box.

At this time, Tingle picked up his tools and put them and the box in his car. When he had driven about two blocks, he opened the box and found the two guns and the two wallets. When his car stopped, he threw the box out of the window. He then put the guns and wallets into the glove compartment. While he checked to see to whom the wallets belonged, he had no time to call their owners.

## OPINION

The Searches and Seizures in the Defendant's Car

Because neither the facts nor the credibility of witnesses is questioned by the defendant, we will conduct a *de novo* review of the trial court's ruling on the motion to quash arrest and suppress evidence. *People v. Foskey*, 136 Ill. 2d 66, 76, 554 N.E.2d 192 (1990). Doing so, we bear in mind that the "fundamental purpose of the fourth

amendment is to protect the legitimate expectations of privacy that citizens possess in their persons, their homes, and their belongings." *People v. James*, 163 Ill. 2d 302, 311, 645 N.E.2d 195 (1994).

The first stop in our analysis of the search and seizure issue is the defendant's arrest for disorderly conduct.

This was not an investigatory stop. It was an arrest on a quasi-criminal charge of violating "ch. 8, sec. 21" of the Chicago Municipal Code. To justify the arrest and any resulting seizure, probable cause, based on the totality of facts and circumstances known to a reasonable and prudent police officer, is required. *People v. Wilson*, 250 Ill. App. 3d 838, 847, 620 N.E.2d 499 (1993).

Officer Brown testified that the arrest was based on Tingle being part of a large crowd and shouting "5-0" when the officers, in uniform, arrived on the scene.

■ Disorderly conduct is conduct that at least has the potential to disturb public order. *People v. Justus*, 57 Ill. App. 3d 164, 167, 372 N.E.2d 1115 (1978) (defendant not guilty of disorderly conduct when she argued with police officer); *People v. Trester*, 96 Ill. App. 3d 553, 421 N.E.2d 959 (1981) (defendant not guilty of disorderly conduct when he threatened to fight police officer if officer would remove his badge).

There must be some relationship between the accused's conduct and the public order, or between the conduct and the right of others not to be harmed or molested. *People v. Slaton*, 24 Ill. App. 3d 1062, 322 N.E.2d 553 (1974). An arrest and conviction for disorderly conduct are justified when the defendant directly bothers or harasses other people. *People v. Kolichman*, 218 Ill. App. 3d 132, 578 N.E.2d 569 (1991); *In re D.W.*, 150 Ill. App. 3d 729, 502 N.E.2d 419 (1986).

■ There was no testimony here that the defendant did anything to threaten public order or a breach of the peace. In fact, when he shouted "5-0," the crowd dispersed. We do not see how these facts justify an arrest for disorderly conduct. Nor do we see any other basis for the defendant's arrest.

The State suggests he could have been arrested for some kind of unspecified narcotics offense. The short answer to that suggestion is that the officers did not see or hear anything that would establish probable cause to believe Tingle was committing a narcotics offense. See *People v. Woods*, 241 Ill. App. 3d 285, 608 N.E.2d 1292 (1993) (no probable cause to arrest defendant on narcotics charges when the police did not witness an illegal act); *People v. Stewart*, 217 Ill. App. 3d 373, 577 N.E.2d 175 (1991) (no probable cause to arrest where police saw defendant transfer a package to another person in a high narcotics activity area, defendant then evading police).

Establishing the illegality of the disorderly conduct arrest does not resolve the fourth amendment issue raised by the defendant.

Officer Brown, whose testimony is undisputed in this appeal, was asked: "Q. Now, after Steve Tingle was placed under arrest, what happened then?" His answer: "He asked if I could secure his vehicle." Tingle then directed the officers to his car, which was double-parked about 1½ blocks from the scene of the arrest.

The officers did not ask the defendant any questions before the "secure his vehicle" request. There was no attempt to obtain the defendant's consent to search the car. In fact, there is no indication the officers knew the defendant had double-parked his car a block and a half away before the defendant made his request. The defendant volunteered the information that led the officers to his car and to the plain view observation of the gun that was stuck between the arm rest and the driver's seat.

Because the defendant volunteered his request to "secure his vehicle," we are faced with an unusual fact situation. The decisions we rely on concern confessions made after an illegal arrest, although we recognize this is a fourth amendment case, not implicating the fifth amendment. Our courts have used a similar analysis when confronted with pure fourth amendment issues. See *People v. Harris*, 159 Ill. App. 3d 592, 512 N.E.2d 80 (1987); *People v. Odom*, 83 Ill. App. 3d 1022, 404 N.E.2d 997 (1980).

A confession following an illegal arrest is not admissible unless it is "sufficiently an act of free will to purge the primary taint of the unlawful invasion." *Wong Sun v. United States*, 371 U.S. 471, 486, 9 L. Ed. 2d 441, 454, 83 S. Ct. 407, 416-17 (1963). See also *Brown v. Illinois*, 422 U.S. 590, 599, 45 L. Ed. 2d 416, 424, 95 S. Ct. 2254, 2259 (1975); *People v. White*, 117 Ill. 2d 194, 222, 512 N.E.2d 677 (1987). In those cases, as here, the burden of showing the purging of the "primary taint" is on the prosecution. *People v. Foskey*, 136 Ill. 2d 66, 86, 554 N.E.2d 192 (1990). Also see *People v. Nash*, 78 Ill. App. 3d 172, 177, 397 N.E.2d 480 (1979) (the State's burden is one of clear and convincing evidence).

The relevant question, then, is whether Officer Brown's observation of the gun came about by exploitation of the initial illegality, the disorderly conduct arrest.

*Brown v. Illinois* sets out the factors to consider in determining whether a confession was the product of an illegal arrest. They are: (1) the proximity in time between the arrest and the confession, (2) the presence of intervening circumstances, (3) the purpose and flagrancy of the police misconduct, and (4) whether *Miranda* warnings were given. *Brown v. Illinois*, 422 U.S. at 603-04, 45 L. Ed. 2d at 427, 95 S. Ct. at 2261-62.

■ We do not stop to analyze each factor. Here, after an arrest for a trivial charge, the defendant brought his double-parked car to the police officer's attention and virtually invited the officer to enter it. The officer did nothing to exploit the illegal arrest. He asked no questions. He used no force. The record does not reflect that Officer Brown handcuffed the defendant or pointed a weapon at him. Brown knew nothing about the defendant's car. Directing Officer Brown to the car was an act of "free will" by the defendant, sufficient to purge the primary taint of the initial illegality. We conclude that Officer Brown was in a place where he had a right to be when he saw the gun. The law does not require him to ignore it. *People v. Schrems*, 224 Ill. App. 3d 988, 997, 586 N.E.2d 1337 (1992).

■ Clearly, when Officer Brown saw the pistol, he had a right to seize it. No warrant was required. *Texas v. Brown*, 460 U.S. 730, 75 L. Ed. 2d 502, 103 S. Ct. 1535 (1983). Possession of a gun in a vehicle is a crime. 720 ILCS 5/24—1(a)(4) (West 1992).

After finding the gun, Officer Brown searched the car "for any additional weapons." In the glove compartment, he found another gun and the two wallets. The defendant contends that even if the seizure of the first gun was permissible, the officer had no lawful authority to search the glove compartment. We do not agree.

Reasonableness is the ultimate touchstone for addressing the constitutionality of a search under the fourth amendment. *Vernonia School District 47J v. Acton*, 515 U.S. 646, 132 L. Ed. 2d 564, 115 S. Ct. 2386 (1995). Probable cause is a "flexible, common-sense standard." *Texas v. Brown*, 460 U.S. at 742, 75 L. Ed. 2d at 514, 103 S. Ct. at 1543.

Officer Brown knew the defendant had been in an area of purported narcotics activity. And he knew the defendant had shouted out a code that is used to alert narcotics dealers that the police are coming. Now he saw that the defendant possessed a loaded handgun that was readily accessible. It is not reasonable to expect the police officer to walk away from the disabled and double-parked car without looking further.

Once Brown found the first gun, he could reasonably believe the entire car contained evidence of criminal activity and that he would be entitled to seize that evidence. *United States v. Ross*, 456 U.S. 798, 72 L. Ed. 2d 572, 102 S. Ct. 2157 (1982). He had reason to believe "the contents of the car offended against the law." *People v. Ehn*, 24 Ill. App. 3d 340, 352, 320 N.E.2d 536 (1974). In short, it was reasonable for Brown to search for other weapons. See *People v. Wiggins*, 45 Ill. App. 3d 85, 358 N.E.2d 1301 (1976).

■ The final question concerning the seizure of evidence is

whether Officer Brown could open the two wallets without first obtaining a search warrant. After seizing two guns and seeing two wallets in these circumstances, Officer Brown acted reasonably when he opened the wallets and looked inside them. See *People v. De La Fuente*, 92 Ill. App. 3d 525, 414 N.E.2d 1355 (1981). At that point, the defendant's expectation of privacy was nil. Requiring Officer Brown to obtain a search warrant under these circumstances "would be a needless inconvenience." *Texas v. Brown*, 460 U.S. at 739, 75 L. Ed. 2d at 512, 103 S. Ct. at 1541.

The trial judge did not err when he denied the defendant's motion to quash arrest and suppress evidence.

The Ogroden Armed Robbery

The defendant raises two issues in connection with the Ogroden trial.

First, he contends he should have been able, on redirect examination, to ask his alibi witness, Floyd Chatman, whether he was lying to help his friend.

Defense counsel asked the question on redirect after the prosecutor established Chatman and Tingle were "good friends":

"Q. And you help him and he helps you, correct?
A. Uh-huh."

The purpose of redirect examination is to meet or explain new matters brought out on cross-examination. New matters include attacks on the witness's credibility. The scope of redirect examination and the form of questions rest in the discretion of the court. M. Graham, Cleary & Graham's Handbook of Illinois Evidence § 611.12 (6th ed. 1994).

Ordinarily, a witness may not be asked on redirect examination whether his testimony on direct examination was the truth, since the answer is not rehabilitating. *Highland Park v. Block*, 48 Ill. App. 3d 241, 362 N.E.2d 1107 (1977).

■ In this case, however, the cross-examination implied that Chatman was lying to help his friend. In final argument, the prosecutor again implied that Chatman was lying to help the defendant. The defense should have been able to ask the witness if that was what he was doing. It was error to unreasonably limit the redirect examination.

We have examined the record to determine whether the error could have had any impact on the outcome of this case. Given the overwhelming evidence against the defendant, we find the error was harmless.

The other issue raised by the defendant has to do with his 15-

year sentence. He claims it is excessive and that the judge did not give adequate consideration to the defendant's "demonstrated rehabilitative potential."

The possible sentence range for armed robbery is not less than 6 years and not more than 30 years. 720 ILCS 5/18—2(b), 730 ILCS 5/5—8—1(a)(3) (West 1992). In order to reduce the sentence, we would have to find the trial judge abused his discretion. *People v. Perruquet*, 68 Ill. 2d 149, 368 N.E.2d 882 (1977).

■ The trial judge heard the evidence at trial and in aggravation and mitigation at the sentencing hearing. This was a case where the defendant first aimed the gun at the victim, then fired it after committing the robbery. We have no reason to believe the judge did not consider all the facts presented at the sentencing hearing. See *People v. Partin*, 156 Ill. App. 3d 365, 509 N.E.2d 662 (1987). We find no abuse of discretion.

The Aguilera Armed Robbery

The defendant contends the pretrial identification procedure in this case was unduly suggestive and that the in-court identification was tainted by that unfair procedure. The defendant's claim is based on the fact that his brother was placed in the lineup with him. The victim, he claims, had been told that two brothers had been arrested. He also says this victim discussed the appearance of the offender with Ogroden, the other victim, before the lineup.

■ Considering the totality of the circumstances surrounding the identification procedure, we see no merit in the defendant's contention. There was no impermissible suggestiveness that gave rise to the substantial likelihood of irreparable misidentification. See *Manson v. Brathwaite*, 432 U.S. 98, 53 L. Ed. 2d 140, 97 S. Ct. 2243 (1977).

Finally, the defendant contends his seven-year sentence for the Aguilera armed robbery should not have been made consecutive to the 15-year sentence in the Ogroden armed robbery.

■ The record does not show that the defendant asked the trial judge for a statement of reasons for the consecutive sentence. We agree with the State that the issue has been waived by the defendant's failure to request a statement of reasons. See *People v. Hicks*, 101 Ill. 2d 366, 462 N.E.2d 473 (1984).

In addition, the trial judge was familiar with all the facts concerning the two crimes and the defendant's background. The defendant's lawyer asked the judge to consider the facts presented during the sentencing hearing on the Ogroden armed robbery conviction.

The offenses were serious and violent. The potential for harm to the victims was great. The day after the second robbery the defen-

718

dant had possession of two loaded guns. In addition, the defendant had a prior conviction for burglary. We see no abuse of discretion in the imposition of a consecutive sentence. See *People v. Hartzol*, 222 Ill. App. 3d 631, 584 N.E.2d 291 (1991).

CONCLUSION

For the reasons stated, we affirm the convictions and sentences in each of the armed robberies.

Affirmed.

CAMPBELL, P.J., and BUCKLEY, J., concur.