THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. VICTOR TRIPP, Defendant-Appellant.

First District (3rd Division)   No. 1—97—2728

Opinion filed July 21, 1999, *nunc pro tunc* June 30, 1999.

Rita A. Fry, Public Defender, of Chicago (Frederick Weil, Assistant Public Defender, of counsel), for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, William Toffenetti, and Michael Chomiak, Assistant State's Attorneys, of counsel), for the People.

JUSTICE BURKE delivered the opinion of the court:

Following a jury trial, defendant Victor Tripp was convicted of four counts of armed robbery and subsequently sentenced to four concurrent terms of 55 years' imprisonment. On appeal, defendant contends that the trial court erred in: (1) denying his motion for a directed finding on the count of the indictment charging him with the armed robbery of Marcos Chavez; (2) finding that the police had probable cause to open a locked footlocker discovered in defendant's car after defendant had been placed under arrest; and (3) sentencing defendant to 55 years' imprisonment since a codefendant received a much less severe sentence. In addition, defendant argues that the trial court's imposition of a 55-year sentence was unduly excessive. For the reasons set forth below, we affirm.

Defendant and a codefendant, Germain Johnson, were indicted on four counts of armed robbery, robbery, aggravated unlawful restraint, and unlawful restraint. Johnson pled guilty to all the counts immediately before trial and received concurrent 15-year sentences. Prior to trial, defendant and Johnson filed a motion to quash their ar-

rests and suppress evidence, arguing the police lacked probable cause to search a footlocker found in the backseat of defendant's car at the time of his arrest. At a hearing on the motion, defendant testified that on November 29, 1995, at approximately 10:30 p.m., he was standing at the corner of Douglas Boulevard and Sawyer Street in Chicago speaking to Johnson. His car was legally parked on Sawyer, facing south on the east side of the street approximately 10 feet from the intersection of Douglas and very close to the curb. Defendant stated he and Johnson had been standing on the corner talking for approximately 40 minutes when the police arrived. According to defendant, he was about 12 feet from his car when he was arrested and was never in the car while the police were at the scene.

On cross-examination, defendant stated that the police officers got out of their squad car, approached him and Johnson and then searched them. According to defendant, the officers then went to his car, shined a flashlight into it, tried to open the door, finally gained entrance by using a slim jim, and searched the car. On redirect, defendant stated that he observed the squad car proceeding north down Sawyer and that Sawyer was a one-way street south.

Wyvonia Pickett, a friend of defendant's, testified as a witness for defendant. She stated that on November 29, she was at a friend's house on Douglas and, at approximately 10:35 p.m., she observed defendant near the corner of Sawyer and Douglas approximately 10 steps from his parked car and he was walking away from the car. Pickett also stated that she saw a police car proceeding in the wrong direction on Douglas, which then turned and went in the wrong direction on Sawyer. Thereafter, Pickett saw the police search defendant and his car. On cross-examination, Pickett stated that she had known defendant for approximately a month prior to his arrest and that she had visited him four or five times in jail since his arrest.

Codefendant Johnson's subsequent testimony was substantially the same as defendant's and Pickett's. In addition, Johnson testified that the police did not recover any property from him as a result of their search and no one ever told him why he was being detained or searched.

In opposition to the motion, the State called Officer Michael Soto as a witness. He testified he was on a routine patrol with his partner on November 29, 1995, and was driving a squad car southbound on Sawyer near the corner of Sawyer and Douglas when he observed a car obstructing traffic on Sawyer. The car, which was occupied by two black males, was parked in the middle of the street and another car had to squeeze by. Soto activated his car's emergency equipment, exited the car, and approached the driver's side of the other car. Soto

then asked the driver of the car, later identified as defendant, for his license and proof of insurance. When defendant stated he did not have that information, Soto had defendant exit the vehicle and placed him under arrest. Soto also testified that after defendant exited the vehicle, he noticed a handgun between the two front seats. At this time, Soto's partner had the passenger, identified as codefendant Johnson, exit the car and both were handcuffed and placed in the officers' squad car. After Soto seized and unloaded the weapon, he performed a search of the car and then noticed that defendant and Johnson partially fit the description of two of the three people who had robbed a jewelry store earlier that day. Specifically, Soto stated:

> "Well, one of the offenders in the original case report I took was noted as having a black jacket and very sleepy, puffy eyes and I noticed one of the offenders, the passenger of that car fit the description of that person."

Soto further stated that defendant also fit the physical description of one of the other men. According to Soto, that description was of a black male, approximately 20 years old, about 5 feet 8 inches tall, 170 or 180 pounds, wearing a black jacket.

Soto also testified that when he searched defendant's car, he discovered gray duct tape, similar to the type used to bind the victims of the robbery, and a large footlocker. Soto and his partner removed the footlocker, pried open its side and saw "numerous amounts of jewelry." Soto recovered $1,000, a gold money clip, a gold chain, and several keys from defendant. Soto's partner recovered a gold chain and two gold medallions from Johnson.

On cross-examination, Soto admitted that the descriptions he had did not mention anything about the suspects' hair or complexion. Soto further testified that defendant did not have a scar on his right hand even though the description he had indicated that one of the suspects had a scar on his hand. Soto admitted that the description he attributed to defendant could "fit many, many, [sic] black males." Soto also stated that he suspected that the jewelry was in the footlocker because when he moved it he heard something inside. Soto further stated that two of the suspects were described in his robbery report as being between 18 and 24 years old, 5 feet 8 inches tall, 160 pounds, and wearing black jackets. After arresting Johnson, Soto discovered that Johnson was 5 feet 11 inches tall and weighed 140 pounds.

After hearing the parties' arguments, the trial court denied defendant's motion to quash and suppress, stating:

> "In this particular case the Court believes that the officers had probable cause to make an arrest, and in fact make the search of that closed case.

*  *  *

When the driver of that car [defendant] *** was asked to produce a license, he was unable to do so, none was produced. When he was asked to produce an insurance card, that also was not produced, and when he was asked to step out, he was placed properly under arrest for those particular violations.

At that time the officer saw a handgun, the handgun in the vehicle[;] therefore, it gave them [sic] probable cause further to arrest this individual, who was already under arrest.

The other individual [codefendant Johnson] *** also was placed under arrest because the Court feels that the handgun was in such a position where it was accessible to either [defendant or Johnson] [and] the officer could place him [Johnson] under arrest because of the access, access to this weapon. But more than that, the officer had confidence in his knowledge, direct knowledge of the victims, of the armed robbery of the jewelry store.

It was not a reading of just a police report, he had actually talked and taken a report of the armed robbery, he knew the descriptions of the people who had committed the armed robbery; so it was more than just that [the descriptions of defendant and Johnson, which were] placed down on the physical paper of the police report.

The description given, including the description about sleepy and puffy eyes clearly fit the passenger [Johnson] in this car.

*  *  *

After shaking the container and after seeing certain objects of jewelry on each of these defendants, knowing that a jewelry store was in fact the subject of the armed robbery, a reasonable person could conclude that there were very well, could have been evidence of that armed robbery in this closed container, the officer, therefore, could in fact search that closed container and elected not to just open it, in fact to force part of it open and look in.

The officer could have gone and opened the whole container. This particular case, a corner is forced open and jewelry was seen here, therefore, the officer looked no further."

At defendant's trial, Manuel Martinez testified that he was the owner of Velasquez Jewelers (the store) located at 3534 West 26th Street in Chicago. On November 29, 1995, Martinez was returning to the store after running some errands and he noticed three black men in the store looking at jewelry. One of the men, later identified as defendant, was speaking with Martinez's wife, Charmayne Rodriguez. One of the other men was standing next to defendant, and a third, later identified as codefendant Johnson, was seated on a chair against the wall. Martinez went into an office to make a phone call and, while he was on the phone, Rodriguez came in to tell him that defendant

wanted a discount on some jewelry. Martinez returned to the showroom to speak with defendant, who stated he wanted to buy a ring. Martinez took the ring into the back room to clean it and, when he returned, defendant stated he also wanted some earrings. According to Martinez, he was getting the earrings when defendant pulled out a gun and pointed it at him. Defendant then stated: "Don't do anything. Pull the things out of your pocket." Martinez then took over $1,000 in currency and a gold money clip out of his pocket and placed them on a showcase.

Martinez further testified that after he emptied his pockets, he, Rodriguez and a third employee were ordered into the store's office by defendant. Once in the office, defendant taped their hands behind their backs. Martinez further stated that he heard someone cock a gun next to his head and he thought that he was going to be shot. Thereafter, two other employees, who were working in the back room repairing jewelry, were brought into the office and bound. Martinez then heard noises like the display cases opening and closing and yelling coming from the front showroom. After a time, when it was quiet, Martinez managed to free himself and called the police. Martinez then went into the front showroom and noticed many items missing from the showcases and jewelry spread all over the floor. When the police arrived, they took pictures, and Martinez gave them a description of the robbers.

At approximately 1 a.m. on November 30, 1995, Martinez received a phone call from the police asking him to come to the police station to view a lineup. After arriving at the station, Martinez identified a large amount of jewelry the police had recovered as the merchandise that had been stolen from his store. Martinez then viewed a lineup at which he identified defendant as the man he talked to who was interested in buying merchandise. Martinez identified codefendant Johnson as the man who was just sitting on a chair until defendant had pulled a gun.

On cross-examination, Martinez stated that he could not recall whether, when he gave descriptions to the police, he told them the color of hair or complexion of the robbers or what clothing they were wearing. Martinez did not tell the police that defendant had a scar on his right hand, even though that fact appeared in the description in the police report. Martinez also stated that he did not tell the police that his money clip had been stolen or that a specific gold chain, which was recovered by the police from defendant or codefendant, had been taken. Martinez did tell the police that one of the robbers, whom he later identified as codefendant Johnson, had "puffy eyes."

Carmen Kenney, the other employee of the store who was in the

front room at the time of the robbery, testified similarly to Martinez's account of the robbery. Kenney additionally stated that, once in the store's office, she was thrown under a desk and one of the men pulled out a red laundry bag in which to place merchandise. Kenney further testified that the men took her cellular telephone and money from her purse and two rings she was wearing. After the police arrived, Kenney told them that the offenders were wearing jackets, one of which was black. The following morning, Kenney went to the police station, viewed a lineup and identified defendant and codefendant as two of the robbers.

On cross-examination, Kenney stated she could not recall whether she told the police, while giving a description, about defendant's hair color or complexion. Additionally, Kenney testified that she did not tell the police that defendant had a scar on his hand.

Charmayne Rodriguez, through an interpreter, testified substantially the same as Martinez and Kenney. In addition, she testified that after defendant and the other men left the store, she ran out into the alley to see if she could see where they had gone. While out in the alley, she met a woman, who was unknown to her at that time, who told Rodriguez that she just saw three men coming from the direction of the store.

Marcos Chavez, one of the employees in the back room repairing jewelry, testified through an interpreter that he was working on November 29, 1995, and at approximately 4:30 p.m. three black men entered the store. From his position working in the back room, he could observe the front portion of the store and see who was coming into and leaving the store. One of the men, later identified as codefendant Johnson, sat in a chair "almost in front of" Chavez. After awhile, Chavez saw a man jump the display counter and order Chavez and his partner at gunpoint to enter the office. After all the other employees had entered the office, the robbers tied all their hands and feet with tape and made them lie facedown on the floor. Chavez heard the men opening and closing display cases in the front room. After the men left and the police arrived, Chavez gave a description of the man he saw sitting in front of him as "a person of a medium height, of black skin, short hair, and with the eyes a bit bulging." The following day, Chavez identified Johnson in a lineup as one of the men who participated in the robbery. Chavez never testified that any property was taken from his person.

Alicia Malagon testified that on November 29, 1995, at approximately 5 p.m., she was coming out of her garage in an alley between Drake and Central Park Avenues. As she was backing out her car, she noticed another car "not parked right." Malagon saw three

black men approaching the car from the direction of 26th Street, and she saw that one was carrying a large laundry bag. As the car passed her, she got a view of the front seat passenger, whom she later identified as defendant. As she started to drive away, she ran into a woman and a man who were looking for three black men. Malagon identified defendant at a lineup on December 5, 1995.

Chicago police officer Joseph Catalvo testified that he and his partner, Michael Soto, were working on November 29, 1995, at approximately 5 p.m., when they received a radio call about a robbery in progress. They proceeded to the scene and learned that the store there had just been robbed at gunpoint by three black males. Catalvo testified that after obtaining a description of the suspects and the car used to drive away, he broadcasted the information and began to protect the crime scene.

Catalvo further testified about the circumstances leading up to defendant's arrest and the discovery of the jewelry. Catalvo's testimony was substantially the same as Soto's had been during the hearing on defendant's motion to suppress. Catalvo also testified that Martinez came to the station early in the morning on November 30 and identified the jewelry as belonging to him, including the specific pieces of jewelry recovered from codefendant Johnson and defendant.

On cross-examination, Catalvo testified that one of the witnesses, while describing the offenders, did state that one had a scar on his right hand, although Catalvo could not recall which witness had given that description. Catalvo further stated that he prepared a report of the robbery in which Johnson was described as "a male black 17, 18 years of age, *** 5-9 in height, 160 pounds, puffy around the eyes." Catalvo also stated that the description he had for defendant was a black male, approximately 5 feet 9 inches tall, 170 pounds, and between 24 to 27 years old.

Thereafter, the State rested. Defendant also rested without presenting any evidence. After the parties' closing arguments, the jury retired and returned verdicts of guilty against defendant on four counts of armed robbery.

During defendant's sentencing hearing, the State presented evidence in aggravation that on November 17, 1995, defendant and two other men robbed a jewelry store at 3942 West North Avenue in Chicago at gunpoint. In addition, the State presented evidence that on November 16, 1995, defendant committed an armed robbery of a Shoe Land at 5600 West Madison Street in Chicago. The State further presented evidence of defendant's two prior convictions for armed robbery, for which defendant received a six-year sentence for each and one prior conviction for armed violence, the sentence for which was included in defendant's sentence for the two prior armed robberies.

In mitigation, defendant presented evidence that he was 24 years old, while incarcerated he received his GED, was employed, successfully severed his ties with a street gang, and spent his time studying the Bible. Defendant further maintained that no one was hurt during the commission of the crime. Defendant also stated that he knew he had made bad decisions in his life and regretted them, that he had "good in him" and that he could change.

In sentencing defendant, the trial court stated that it was considering all the factors in aggravation as well as the "personal history" of defendant and the steps he had taken to be productive. The trial court was of the opinion that the "only appropriate sentence to deter *** [defendant] and others" was a sentence of 55 years' imprisonment on each count, to run concurrently. Defendant's subsequent motion to reconsider his sentence was denied. This appeal followed.

Defendant first argues that the trial court erred in denying his motion for a directed finding after the State's case in chief as to the count of the indictment that charged defendant with the armed robbery of Marcos Chavez because there was no evidence that anything was taken from Chavez. The State argues that defendant was proven guilty of the offense based on the evidence that defendant stole jewelry from the store where Chavez worked.

■■ It is well settled that when a defendant challenges the sufficiency of the evidence, the question is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Collins*, 106 Ill. 2d 237, 261, 478 N.E.2d 267 (1985). A person commits the offense of armed robbery when he takes property from the person or presence of another by the use of force or the threat of force while armed with a dangerous weapon. 720 ILCS 5/18—2 (West 1996). While the property taken need not be within the immediate possession of the victim, the victim must have had sufficient possession or control so that the force or threat of force was the means by which the property was taken. See *People v. Blake*, 144 Ill. 2d 314, 579 N.E.2d 861 (1991); *People v. Smith*, 78 Ill. 2d 298, 302-03, 399 N.E.2d 1289 (1980).

In *People v. Braverman*, 340 Ill. 525, 173 N.E. 55 (1930), upon which the State here relies, the defendant was convicted of robbing a Walgreen's store. The evidence established that the defendant forced the manager of the store to open the safe and remove the money from inside, which the defendant took. The defendant argued on appeal that since the money was not actually possessed by the manager, he could not be convicted of the robbery of the manager. In rejecting this argument, our supreme court found that "[t]he words 'taking from

the person of another,' as used in the common-law definition of robbery, were not restricted in their application to those cases in which the property stolen was in actual contact with the person of the one from whom it was taken, but included within their meaning the taking, by force or intimidation from the presence of the person assaulted, of property which either belonged to him or was under his personal control and protection." *Braverman*, 340 Ill. at 530. The *Braverman* court found that since the manager was the "custodian" of the money the defendant took, the robbery was complete.

■ In the present case, although there was no testimony from Chavez or any other any witness that any property was taken from Chavez's person, we believe that, when viewed in the light most favorable to the State, the evidence supports the jury's verdict. Chavez was an employee of the store entrusted with valuable merchandise. He was on the premises, working on jewelry at the time of the robbery. He was in possession of pieces of jewelry at the time of the robbery. We believe that it is a reasonable assumption, based on all the evidence, that some of the jewelry taken in the robbery was jewelry that was under Chavez's possession or control and in his "presence." See generally *Braverman*, 340 Ill. at 530.

We briefly note that defendant's reliance on *People v. Robinson*, 92 Ill. App. 3d 397, 416 N.E.2d 65 (1981), and other similar cases, is misplaced. See also *People v. Gaines*, 88 Ill. 2d 342, 430 N.E.2d 1046 (1981); *People v. Triplett*, 138 Ill. App. 3d 1070, 487 N.E.2d 39 (1985); *People v. Jackson*, 72 Ill. App. 3d 231, 390 N.E.2d 47 (1979). In all of those cases the reviewing court found that the defendants were improperly convicted of armed robbery because of the fact that no property was actually taken from them individually. The present case is not a situation, as in *Robinson, Gaines, Triplett*, and *Jackson*, where there was no evidence that the alleged victims had any property taken. Rather, notwithstanding that Chavez did not have any property personally taken from him, he was an employee of the store, working repairing jewelry at the time of the robbery and, at least in part, was responsible for the jewelry in the store.

Defendant next argues that the trial court erred in denying his motion to suppress evidence and in finding that the police had probable cause to conduct a warrantless search of the locked footlocker the police recovered from defendant's vehicle after his arrest. The State argues that "the police officers had probable cause to search the ***
[footlocker] because the officers saw a gun [in the car], they found some of the stolen items on defendant and codefendant, they found the tape used to tie-up [*sic*] the victims, and they determined that the two men fit the description of the offenders in an earlier armed rob-

bery." Additionally, the State argues that the search of the footlocker was valid as a search incident to a lawful arrest.

A trial court's ruling on a motion to suppress evidence is generally subject to reversal only if it is against the manifest weight of the evidence, but where there is no dispute about the facts or credibility of witnesses, the decision is subject to *de novo* review. *People v. Anaya*, 279 Ill. App. 3d 940, 665 N.E.2d 525 (1996). This court may affirm the judgment of the trial court on any issue appearing in the record, and the State may defend the trial court's ruling "on any grounds sustained in the record regardless of the reasoning used by the trial court." *People v. Kolichman*, 218 Ill. App. 3d 132, 138, 578 N.E.2d 569 (1991).

In order to justify a warrantless search of a car, it must be shown that the facts known to the officer at the time of the search would justify a reasonable person to believe that the car contained contraband. *People v. Evans*, 259 Ill. App. 3d 650, 631 N.E.2d 872 (1994). In the present case, the officers stopped defendant's vehicle for a routine traffic violation. In so doing, the officers observed a handgun in plain view in the car. Once the weapon was seized, it was not unreasonable for the officers to search the rest of the car. *People v. Tingle*, 279 Ill. App. 3d 706, 715, 665 N.E.2d 383 (1996). Accordingly, we find that the seizure of the footlocker was not unreasonable.

■ It is unnecessary for this court to engage in a protracted debate about the reasonableness of the search of the footlocker based upon the officers' probable cause. The trial court found that the officers possessed probable cause based on the totality of the circumstances. Even assuming that ruling was error, the State argues that the search of the footlocker was valid as a search incident to a lawful arrest. See *New York v. Belton*, 453 U.S. 454, 69 L. Ed. 2d 768, 101 S. Ct. 2860 (1981); *People v. Bailey*, 159 Ill. 2d 498, 639 N.E.2d 1278 (1994). Defendant contends that the State has waived this argument. However, as discussed above, the State may defend the appeal on any issue sustained by the record, and this court is free, regardless of the parties' arguments, to affirm the trial court on any issue appearing of record, regardless of the reasoning of the trial court. Therefore, even if we were to find the State waived this argument, this court is free to consider it in determining whether to affirm the trial court. See *Bailey*, 159 Ill. 2d at 506 (holding that even where neither party raised the issue of a search incident to a valid arrest, " '[T]he waiver rule is one of administrative convenience rather than jurisdiction ***.' [Citation.]").

In *Bailey*, which involved the consolidated appeals of two defendants, the police stopped the automobiles being driven by the defendants and arrested them for minor violations, in one case for

driving on a suspended driver's license and in the other for possession of alcohol by a minor. Subsequent to the arrests, the police searched the passenger compartments of the vehicles and discovered narcotics. In upholding the searches, our supreme court, in applying the rule announced in *Belton* that the police may search the passenger compartment of a vehicle after arresting a person within the car, held:

> " 'Accordingly, we hold that when a policeman has made a lawful custodial arrest of the occupant of an automobile, he may, as a contemporaneous incident of that arrest, search the passenger compartment of that automobile.
>
> It follows from this conclusion that the police may also examine the contents of any containers found within the passenger compartment, for if the passenger compartment is within reach of the arrestee, so also will containers in it be within his reach.' " *Bailey*, 159 Ill. 2d at 504, quoting *Belton*, 453 U.S. at 460, 69 L. Ed. 2d at 775, 101 S. Ct. at 2864.

The *Bailey* court further stated:

> "Although a search incident to arrest is based on the need to disarm and discover evidence, the authority to search does not depend on the probability in a particular case that weapons would in fact be found or evidence would in fact be destroyed. ' "A custodial arrest of a suspect based on probable cause is a reasonable intrusion under the Fourth Amendment; *that intrusion being lawful, a search incident to the arrest requires no additional justification.*" ' (Emphasis in original.)" *Bailey*, 159 Ill. 2d at 504, quoting *Belton*, 453 U.S. at 461, 69 L. Ed. 2d at 775-76, 101 S. Ct. at 2864, quoting *United States v. Robinson*, 414 U.S. 218, 235, 38 L. Ed. 2d 427, 440-41, 94 S. Ct. 467, 477 (1973).

Even though the defendant may no longer have access to the vehicle and may be restrained in custody, the police are still free to search the vehicle. *Bailey*, 159 Ill. 2d at 506. Further, it has been held that locked glove compartments are subject to search as containers within the vehicle. See *United States v. Woody*, 55 F.3d 1257 (7th Cir. 1995).

■ In the present case, defendant was arrested after he failed to produce his driver's license and insurance and the police subsequently discovered a handgun beside the front passenger seat. At this point, defendant was under arrest for a weapons charge as well as a traffic violation. The officers were free to search the passenger compartment of the vehicle (*Bailey*, 159 Ill. 2d at 506), including any containers found within the passenger compartment, such as locked glove compartments (*Woody*, 55 F.3d at 1270), or a coat pocket that was zipped closed (*Belton*, 453 U.S. at 460, 69 L. Ed. 2d at 774-75, 101 S. Ct. at 2864). Based upon *Belton* and *Bailey*, we therefore find that the locked footlocker, found within the passenger compartment of

defendant's vehicle, was properly searched incident to his lawful arrest.

Defendant next argues that the trial court abused its discretion in imposing four concurrent 55-year sentences. Specifically, defendant argues that the "gross disparity in sentences imposed on *** [defendant] and the co-defendant [of 15 years] was unjustified and fundamentally unfair" and that "the imposition of a 55-year sentence for armed robbery was unduly excessive." The State argues the sentences imposed were well within the trial court's discretion.

■ It is well settled that where a sentence is within the statutory range of possible sentences, a trial court's imposition of a sentence will not be disturbed on appeal absent an abuse of discretion. *People v. Jones*, 168 Ill. 2d 367, 659 N.E.2d 1306 (1995). A sentence is not excessive simply because one offender receives a longer sentence than another offender (see *People v. Brown*, 267 Ill. App. 3d 482, 641 N.E.2d 948 (1994)), but any disparity in sentences cannot be arbitrary and unreasonable (*People v. Ralon*, 211 Ill. App. 3d 927, 958, 570 N.E.2d 742 (1991)). It is proper for the trial court to consider the degree of each offender's participation, rehabilitative potential, background, and criminal history in fashioning sentences. *Ralon*, 211 Ill. App. 3d at 958. When a defendant pleads guilty, accepts responsibility for his actions, and ensures the prompt application of justice, it is not error for the trial court to exercise leniency. *People v. Taylor*, 260 Ill. App. 3d 976, 632 N.E.2d 2347 (1994).

In *Ralon*, relied upon by defendant here, the defendant was convicted of armed robbery and sentenced to 12 years' imprisonment. His codefendant, who pled guilty to armed violence, was sentenced to seven years' imprisonment. The *Ralon* court, in upholding the sentences, noted that the defendant did not show any remorse, did not accept his guilt, and continued to protest his innocence.

In *People v. Milton*, 182 Ill. App. 3d 1082, 538 N.E.2d 1227 (1989), the defendant was convicted of armed robbery, robbery, and theft and sentenced to 30 years' imprisonment. A codefendant pled guilty and was sentenced to 8$^1$/$_2$ years' imprisonment. On appeal, the *Milton* court reduced the defendant's sentence to 12 years, noting that the defendant was young at the time of the crime and had no prior record, whereas his codefendant was on probation for burglary at the time of the offense, and the victim was not injured. *Milton*, 182 Ill. App. 3d at 1096.

In *People v. Banks*, 241 Ill. App. 3d 966, 609 N.E.2d 864 (1993), the defendant was convicted of armed robbery and sentenced to 20 years' imprisonment, whereas his codefendants were sentenced to 7 years' imprisonment. All of the codefendants were found to have

participated equally in the crime and to have substantially similar criminal backgrounds. Based on those factors, the *Banks* court found the defendant's sentence to be excessive and "fundamentally unfair." 241 Ill. App. 3d at 985.

In *People v. Jackson*, 145 Ill. App. 3d 626, 495 N.E.2d 1207 (1986), the defendant was convicted of murder, armed robbery and conspiracy to commit murder. He was sentenced to concurrent terms of 80 years, 30 years, and 7 years, respectively. The "admitted killer" of the victim, who was a codefendant, was sentenced to 30 years' imprisonment for murder. In reducing the defendant's sentence, the *Jackson* court noted that although the criminal records of the defendant and codefendant were not dissimilar, the defendant was younger than his codefendant, the defendant's work record was a mitigating factor, and the codefendant was the more active participant in the crime.

In *People v. Daniels*, 173 Ill. App. 3d 752, 527 N.E.2d 993 (1988), the defendant was sentenced to a total sentence of 120 years' imprisonment for home invasion, armed robbery and related offenses, whereas his codefendant, who pled guilty on the morning of trial, was sentenced to 30 years' imprisonment. The evidence relating to the defendant's sentence showed that the codefendant was more active in the crime, that the defendant had taken steps to further his education since being in prison, the defendant was young, and the trial court failed to adequately take into consideration any rehabilitation potential of the defendant in fashioning a sentence. Based on those facts, the *Daniels* court found the 90-year disparity in the defendant's and his codefendant's sentences too great and reduced the defendant's sentence to 30 years.

In the present case, unlike the facts in *Ralon, Milton, Banks, Jackson* and *Daniels*, which defendant relies upon, the evidence established that defendant's criminal history was more extensive than his codefendant's, defendant, unlike his codefendant, was eligible for an extended-term sentence based upon his prior criminal history, defendant had been paroled from prison only 10 weeks prior to his participation in the robbery, defendant was older than his codefendant, evidence supported a finding that defendant was the main actor in the robbery, and there was evidence presented that defendant had participated in two other armed robberies since his parole. Given these facts, the trial court found that defendant's rehabilitative potential was low, especially since he was just recently paroled. The trial court examined defendant's social and educational background and considered other mitigating factors and then fashioned a sentence based upon a balancing of all the aggravating and mitigating factors. Given defendant's criminal background and participation in the crime,

we find that defendant's sentence was not so disparate in comparison to his codefendant to be arbitrary and unreasonable.

Defendant next argues that his sentence of 55 years was unduly excessive and that the trial court failed to properly take his rehabilitative potential into account when it sentenced him. The State argues that the sentence was proper and within the statutory limits.

■ In imposing sentence, the trial court must balance the conflicting needs of protecting society, the defendant's potential for rehabilitation, and restoring the defendant to useful citizenship. *People v. Jeter*, 247 Ill. App. 3d 120, 616 N.E.2d 1256 (1993). "A defendant's rehabilitative potential, however, is not entitled to greater weight than the seriousness of the offense." *People v. Coleman*, 166 Ill. 2d 247, 261, 652 N.E.2d 322 (1995). As stated above, the imposition of sentence is a matter of judicial discretion and will not be disturbed on review absent an abuse of that discretion. The mere fact that a sentence falls within the statutory limits does not, *per se*, make the sentence proper. *People v. Steffens*, 131 Ill. App. 3d 141, 475 N.E.2d 606 (1985). "However, there is a rebuttable presumption that the sentence imposed was proper, which is only overcome by an affirmative showing that the sentence imposed varies greatly from the purpose and spirit of the law or is manifestly violative of constitutional guidelines." *People v. Lindsay*, 263 Ill. App. 3d 523, 533, 635 N.E.2d 351 (1994).

In support of his argument that his sentence was excessive, defendant relies on numerous cases, all of which we find to be either distinguishable or unpersuasive because they involved situations where there were mitigating factors not present here. See *People v. Neither*, 230 Ill. App. 3d 546, 595 N.E.2d 124 (1992) (the offenses did not involve an armed robbery, and the defendants were young, with minimal criminal backgrounds, and were not armed); *People v. Kosanovich*, 69 Ill. App. 3d 748, 387 N.E.2d 1061 (1979) (the defendant had drug and mental health problems and no violent crimes in her background); *People v. Nelson*, 106 Ill. App. 3d 838, 436 N.E.2d 655 (1982) (neither of the defendants had any violent crimes in his criminal history and had completed his schooling).

We also find that defendant's reliance on *People v. Zunker*, 184 Ill. App. 3d 816, 540 N.E.2d 1113 (1989), *People v. Maldonado*, 240 Ill. App. 3d 470, 608 N.E.2d 499 (1992), *People v. Smith*, 50 Ill. App. 3d 320, 365 N.E.2d 558 (1977), and *People v. Rickard*, 99 Ill. App. 3d 914, 425 N.E.2d 1317 (1981), is misplaced. These cases involved murders and facts that are not even remotely similar to the case at bar. While defendant posits that such cases are relevant to show that in cases where more heinous crimes were committed, less severe penalties were imposed, we note that in all these cases there were facts that

justified a lesser sentence. For example in *Maldonado*, the court noted that the maximum sentence was inappropriate because there was no evidence that the killing was a planned execution or a murder-for-hire. *Maldanado*, 240 Ill. App. 3d at 486.

■ In the present case, defendant had just been paroled after serving a term of imprisonment for armed robbery and armed violence, and had engaged in two armed robberies less than two weeks prior to his arrest for the armed robbery at issue in this case. Defendant used a gun in all of his crimes that threatened serious bodily harm throughout the performance of his acts. The trial court indicated that its order of sentence "considered all the evidence[,] *** all the information contained in the pre sentence [*sic*] investigation, the evidence *** in aggravation, the arguments *** in aggravation and mitigation in this courtroom, and *** [defendant's] own statement made in open court." Additionally, the trial court specifically noted that it was taking into consideration "the personal history of *** defendant, his age, his social background, the fact that he has two natural and five half siblings. *** His educational background both at the elementary school and high school level. The fact that he did receive his GED while in the penitentiary at Menard. His prior employment history. *** Physical and mental health, the fact that he does not suffer from any physical or mental health problems, the fact that he has said he does not consume alcohol or drugs."

We do not believe the trial court failed to take defendant's rehabilitative potential into consideration. We find that given the fact that defendant was recently paroled from prison for an armed robbery conviction, coupled with the evidence demonstrating that defendant committed two other armed robberies prior to being apprehended for the armed robbery in this case, the trial court could properly have found defendant's rehabilitative potential minimal. Further, the trial court noted that there was a serious need to deter others from similar conduct. Given the clear expression of the trial court that it considered not only the aggravating factors, but also those factors in mitigation, we cannot say that the trial court's sentence, which was within the statutory guidelines, was excessive.

For the reasons stated, the judgment of the circuit court is affirmed.

Affirmed.

CAHILL, P.J., and CERDA, J., concur.